**GOTTLIEB, Plaintiff, v. MEAD CORPORATION et al., Defendants.**

Common Pleas Court, Montgomery County.

No. 101570.   Decided October 8, 1954.

354

Harrison, Spangenberg & Hull, Cleveland, for plaintiff.
Smith, Schnacke & Compton, Collidge, Becker, Wall & Wood, Turner, Wells & Courson, Dayton, for defendants.

## OPINION
By MARTIN, J.

### PRELIMINARY STATEMENT

Plaintiff, a Mead Corporation stockholder, brings this derivative action against defendants, directors and/or stockholders of The Mead Corporation and/or The Mead Sales Company, and against The Mead Corporation and The Mead Sales Company, to enjoin an alleged wrongful appropriation and diversion of the sales and purchasing functions and the resulting business opportunities and profit, from The Mead Corporation to The Mead Sales Company and its stockholders, to require an accounting, and for other relief.

Defendants deny that there was any wrongful appropriation or diversion of the purchasing or sales functions and profits of The Mead Corporation, and claim, among other things, that all transactions between The Mead Corporation and The Mead Sales Company were performed honestly, in good faith, and for the best interests of The Mead Corporation.

Plaintiff, during and since the trial hereof, has withdraw, abandoned, modified, or changed a number of her original claims made in her amended petition because of lack of proof or proof to the contrary, and consequently plaintiff, as hereinafter detailed, has abandoned in part and greatly modified the relief requested.

### GENERAL FINDING

Since this Court has no doubt whatsoever from the evidence and the law as to what finding should be made on the merits, it would be unfair to leave any inference to the contrary by deferring its general finding to the end of this decision.

Therefore, after extensive and intensive consideration of the evidence and the law applicable thereto, the Court finds that the plaintiff has completely and wholly failed to make out a case against defendants, or any of them on any and all theories of law invoked by plaintiff's amended petition, urged by plaintiff's counsel, or suggested by the evidence, and finds generally for the defendants and against the plaintiff on all the issues made up on the merits.

The following will summarize the respective contentions of the parties, the evidence bearing thereon, and the findings of the Court supporting the above general finding.

## CLAIMS IN THE PLEADINGS

Plaintiff originally brought this action allegedly in the right and on behalf of The Mead Corporation and its stockholders to enjoin the defendant, The Mead Sales Company, and the other defendants, from continuing to appropriate the sales and purchasing functions of The Mead Corporation, and to enjoin the alleged resulting diversion or siphoning off of profits or monies by The Mead Sales Company from The Mead Corporation through Mead Sales buying paper products from and selling supplies to The Mead Corporation, and to require The Mead Sales Company and its stockholders to account to The Mead Corporation for profits and monies allegedly diverted.

Plaintiff claims that defendant, George H. Mead, an officer and director of Mead Corporation, dominated and controlled the other Mead Corporation Directors, and that he and other defendant Directors and stockholders of The Mead Corporation, and/or the The Mead Sales Company, acting in concert pursuant to a plan or scheme. (conspiracy), appropriated and diverted to The Mead Sales Company the sales and purchasing functions of Mead Corporation, and diverted to themselves as stockholders of Mead Sales opportunities for profit and profits of The Mead Corporation in the form of discounts or commissions on paper products bought from and supplies sold to The Mead Corporation. That the individual defendants directly, and indirectly through their and their families' stockholdings in and control of the defendant, Mead Investment Company (which owns stock in The Mead Sales Company)— own approximately 50% of The Mead Sales Company stock.

Plaintiff claims The Mead Corporation had the resources, personnel, and the means, and was in a position to sell for itself or through a wholly owned subsidiary, its own products at the same prices obtained by Mead Sales without paying commissions thereon. That the demand for Mead products has for years been greater than the supply, and that little or no sales effort was required to market them. That selling its paper products, and buying its raw materials and supplies were necessary functions belonging to The Mead Corporation, and that all the profits to be derived therefrom belonged to The Mead Corporation. That the Mead Sales Company has wrongfully appropriated these functions and the business opportunities which were presented to The Mead Corporation from about 1921, when the Sales Company was formed, to the present time.

Plaintiff further claims that the price set forth in The Mead Corporation's outstanding option to buy eighty percent of The Mead Sales Company stock is excessive, that the Directors failed to have it reduced and failed to exercise the option in the interest of the corporation.

Plaintiff finally claims that The Mead Corporation Directors acted in bad faith and were grossly negligent in the above respects, and as a result breached their fiduciary duties to the Corporation and its stockholders. Plaintiff contends that a demand by her upon Mead Corporation Directors to correct the situation or to bring this action would

have been futile, as they participated in the plan of diversion and would not have complied.

The defendants, The Mead Corporation, The Mead Sales Company, and Mead Investment Company, deny generally and specifically plaintiff's claims charging diversion of profits, of bad faith, domination and control by George H. Mead or by any individual defendants, of the actions of The Mead Corporation Directors in dealing with The Mead Sales Company; deny that defendant, The Mead Sales Company, made large profits from The Mead Corporation business; and deny that the failure of The Mead Corporation to exercise the option to purchase the Mead Sales Company stock resulted in any damage to The Mead Corporation.

Said defendants claim that all transactions between The Mead Corporation and The Mead Sales Company were performed honestly and in good faith; that they were fair to and in the interest of The Mead Corporation; that the directors and officers of The Mead Corporation acted honestly and in good faith, and in the exercise of their best judgment; and that the decisions made by them and the actions taken pursuant thereto were in the best interests of The Mead Corporation.

Defendants further claim that full information concerning the partial distribution of The Mead Corporation products through The Mead Sales Company and the stock holdings of The Mead Investment Company in The Mead Sales Company and in The Mead Corporation, and the respective stock holdings, if any, of the Directors of The Mead Corporation in each of said companies, have been matters of public record and knowledge for many years, the same having been set forth in full in registration statements filed by The Mead Corporation with the Securities and Exchange Commission in 1937 and subsequent thereto; and further was fully disclosed in other publications and public records long prior to the commencement of this action, and that in consequence plaintiff is guilty of laches and is estopped and barred from maintaing this action.

Defendants further claim that this action, in any event, is barred by both the four year and ten year limitation statutes of Ohio.

The remaining individual defendants, excepting Charles R. Van de Carr III, who was dismissed as a party defendant, have asserted similar defenses.

**PLAINTIFF' MODIFICATION AND CHANGE IN ISSUES AND RELIEF**

As the Court has said, the issues made up by the pleadings have been substantially reduced or modified through plaintiff's abandonment of several of her more serious charges against defendants, and by shifts in her position as to the legal significance of the evidence, and the relief justified thereby.

Plaintiff has abandoned the following claims made in her amended petition:

**First**: That The Mead Sales Company diverted profits or moneys from The Mead Corporation from the sale of wood plup and other raw materials and supplied to or by Mead Corporation.

**Second**: That The Mead Corporation should be required to organize and develop its own sales department to take over all the sales of

Mead products now and heretofore handled by The Mead Sales Company, and that the Mead Sales Company should be enjoined from selling Mead products.

**Third:** That The Mead Sales Company was organized in 1921 for the specific purpose of appropriating and diverting the sale and purchasing functions and profits of The Mead Corporation.

**Fourth:** That the sale of Mead Corporation products by Mead Sales was improper from 1921 to 1932.

With relation to the first item abandoned by plaintiff, plaintiff's counsel states they are making no claims with relation to wood pulp and presumably other supplies due to the fact that buying and selling pulp was not primarily a function of The Mead Corporation; that such function exercised by Mead Sales was completely divisible from its paper business; and that he saw nothing wrong in the wood pulp phase of Mead Sales business.

As to the second item, plaintiff now states that although The Mead Corporation should have set up its own sales division between 1932 and 1940, nevertheless Mead Sales has been doing, and is now doing, a good job selling Mead Corporation products, and she now has no objection to The Mead Sales Company selling and continuing to sell Mead Corporation products, provided The Mead Corporation receives a substantial share of Mead Sales profits from Mead products through substantial stock holdings in The Mead Sales Company, as she claims the sales function and profits derived therefrom belong to The Mead Corporation.

As to the third item, plaintiff admits that the evidence shows that The Mead Sales Company was organized in 1921 to sell paper pulp, and there was no intention or plan whatsoever on the part of anyone in the organization at that time to have Mead Sales engage in the sale of paper.

As to the fourth item, plaintiff admits that there was nothing improper in the sale of Mead Corporation products by Mead Sales during the period from 1921 to 1932.

Plaintiff has changed or shifted her position with relation to the claims set forth in her amended petition, in that she now admits or claims—

**First:** That The Mead Sales Company, aside from its pulp sales, is in fact a fully integrated department or division of the Mead Corporation, serving its interests, and works in close co-operation therewith, instead of a fully independent organization operating at arm's length, in competition with, or at the expense of Mead Corporation, as suggested by the amended petition.

**Second:** That the function of The Mead Sales Company, selling Mead Corporation paper products, instead of being transferred to The Mead Corporation as a function belonging exclusively thereto, should be continued by The Mead Sales Company as a partly or wholly owned subsidiary.

**Third:** That The Mead Sales stock interest of George H. Mead, a stockholder and Director in both Corporations, and The Mead Sales stock interests of the Mead family held by The Mead Investment Company, should be considered as held in trust for The Mead Corporation.

The plaintiff makes no claim requiring Mead Sales Company to account for net profits realized on Mead Corporation business, and makes no claim against the other stockholders of Mead Sales either as to their stock or the proceeds therefrom.

**Fourth:** That such 40% Mead stock interest should be transferred to The Mead Corporation, with compensation made for the original capital invested, plus interest, less dividends received, and that none of the remaining 60% of the stock need now be transferred.

The changes or shifts in position recited above, when considered in connection with the claims withdrawn or abandoned, suggest, in spite of plaintiff's lip service to the contrary, that she has substantially abandoned her charges of conspiracy, gross negligence, and tainted profits, which leaves her in a position of disagreement with the policy of The Mead Corporation in not having its own substantially controlled sales subsidiary through stock ownership.

## THE EVIDENCE
### GENESIS AND DEVELOPMENT OF MEAD PAPER MANFACTURING AND SALES COMPANIES

The evidence shows that George H. Mead first associated himself with The Mead Paper Company in 1902, and thereafter, in 1905, at the request of a creditor's committee, some fifty-nine years after it was founded by his grandfather and several partners in 1846, he took over the management to improve its operation. In 1905 it had two mills in operation, one in Dayton, the other in Chillicothe, Ohio; that the company, then in severe financial straits, had one large customer, the Crowell Publishing Company of Springfield, Ohio, which purchased its entire output of publication paper, although it made a small quantity of free white sheets in addition, which was sold to a few jobbers. In 1906 the company showed progress, doing a $400,000 business, and was re-organized as The Mead Pulp and Paper Company, with $50,000 in new capital added from the sale of preferred stock.

Mr. Mead, from 1907 to 1922, had an extended and unusual experience while acting in executive capacities in the management and/or sales of paper products of three Canadian Companies, Lake Superior, Spanish River, and Abitibi. These companies, supported largely by British and Canadian capital, sold both through their own organizations and through independent sales agencies, the latter being initiated by George H. Mead individually and the G. H. Mead Company. Selling through the independent Mead organization was more successful. In fact the G. H. Mead Company became the seller of the largest newsprint tonnage in the United States, as well as considerable pulp. During the latter part of the period, the sale and distribution of pulp was somewhat neglected, so that with the consent of the Canadian interests the Mead Sales Company was organized in 1921 for the purpose of selling pulp, and the pulp specialists in the G. H. Mead Company were separated and became executives and shareholders in The Mead Sales Company. The G. H. Mead Company thereafter handled newsprint exclusively.

During the 1906 to 1922 period, Mead Pulp and Paper Company continued as a publication mill serving Crowell Publishing Company direct with an increased tonnage, and it continued making some free

white sheets on the side. During this period no sales department was necessary, and one man handled the merchant trade and the servicing of the Crowell cost plus contract executed in 1910.

As a result of the 1920 depression, Crowell Publishing was unable to take its contract tonnage from Mead in 1922, under a ten year contract executed in 1921, and requested Mead Pulp and Paper to sell a large share of its tonnage. Since Crowell could demand its full contract tonnage at any time under the contract, Mead Pulp and Paper elected not to set up its own sales organization, as it could not guarantee delivery to jobbers if Crowell took all or most of its tonnage, which would tend to destroy good will, nor could it guarantee continued employment in such event to a sales staff, as the situation was temporary. The G. H. Mead Company could not assume the responsibility for such sales as it handled newsprint exclusively, and other independent sales agencies would not take on additional paper to sell as their own suppliers were overstocked. So, as a temporary measure, Mead Pulp and Paper, knowing of George Mead's success in marketing Canadian paper through independent sales organizations including his own, turned over the sale of such paper to The Mead Sales Company, which had experienced personnel, with time available for such work, as the pulp business had fallen off. The Mead Sales Company was successful in temporarily disposing of large quantities of the Crowell tonnage to jobbers, its sales totaling $754,634 in the year ending April 30, 1923.

During the middle 20's, the executives of Mead Pulp and Paper entered into further publication contracts with Reader's Digest, Time, and others, thereby expanding their publication tonnage without needing a sales department. During the same period Mead Sales Company sold various types of merchant paper, made by Mead Pulp and Paper, to jobbers, in an effort to build up a jobber trade for Mead Pulp and Paper. This sales effort, somewhat experimental, utilized the personnel of the sales company to determine the possibilities of various products. The sales company bought white paper and groundwood paper from Mead Pulp and Paper at standard discounts, and assumed practically all losses on creditors accounts not paid.

In 1927 the Frazer Paper Company of Maine called upon Mead Sales to market and sell its products, and Mead Sales sold large quantities to Sears-Roebuck and others until 1932, when Frazer got into financial difficulty, and in the ensuing re-organization set up its own sales department. The sale of Frazer paper was the largest portion of Mead Sales paper business from 1927 to 1932. As a result of Mead Sales contacts with Frazer, a number of Frazer customers switched to Mead Corporation.

Shortly after the Frazer Company had financial difficulties, a number of small paper mills in the United States had difficulty in merchandising their products through their own selling organizations. Two of these were Dill and Collins and Wheelwright. At the request of these two companies, Dill and Collins in 1932, and Wheelwright in 1934, Mead Sales and Mead Corporation gave their assistance, and later Mead Corporation purchased both companies, retaining the Dill and Collins and Wheelwright names, and marketing their brands and grades of fine

writing papers, blotting papers, Bristols, including index cards, mill blanks, etc., under their trade names to an expanding group of paper merchants and jobbers through the 1930's and thereafter

About 1935 The Mead Corporation began to develop its bond paper line, including Moistrite bond and Moistrite business papers, and in the course of the next ten or fifteen years it developed other lines, including Board Specialties. By 1950 The Mead Sales Company had developed some one hundred thirty paper merchant outlets handling Mead Corporation products, many of them obtained through Dill and Collins and Wheelwright sources. By early 1954 the number of paper merchants had increased to three hundred eighty-five, the largest number in the white paper business.

During the period beginning in the late 20's, and particularly from the middle 30's forward, The Mead Corporation, with the assistance of the highly specialized sales services of The Mead Sales Company, diversified their paper products from the very few lines in the beginning to the largest number of white and book paper lines in the entire white paper business, and rose from a position of a publication mill with comparatively small tonnage in 1921, to one of the three largest producers of white papers in the business in 1953 and 1954.

Beginning about 1928, the Mead Corporation became interested in pulp and paper products that could be made from Chestnut in Southern United States, and built four or five plants in selected sites, which turned out Kraft products and made Chestnut board, a paper board product known as "Ninepoint."

The Mead Paper Board Corporation was formed and operated the mills in conjunction with owners of the extract plants, a joint operation. Later, in 1930 or 1931, a consolidation was effected and the extract companies came into The Mead Corporation. The Mead Sales was first requested to sell the Chestnut board, and after some discussion it was decided that Mead Corporation should employ specialists in this field, if possible, as the existing sales staff was very busy with Frazer products. A top salesman in the LaBoitaux Company in Cincinnati was induced to take on the sale of the Chestnut board, which was successfully distributed through the LaBoitaux Company. Several large contracts, developed largely by The Mead Corporation, became direct contracts like the Crowell contract, which the LaBoitaux Company assisted in servicing.

In the middle 40's the LaBoitaux executive, in charge of the sale of the Chestnut board, died, and because his successor was unacceptable to The Mead Corporation and a number of the younger salesmen of the LaBoitaux Company wanted to work for Mead and sell the Chestnut board, a new sales corporation was formed in 1946, called The Mead Board Sales Company.

However, for a couple of years the Chestnut board and related business handled by the salesmen formerly from LaBoitaux continued to be handled by them, in cooperation with The Mead Sales Company, which had been handling board specialties, such as book covers, cigar boxes, and coat hangers, made at the Lynchburg mill since 1936. In 1948, The Mead Sales Company turned over, without compensation, its

entire specialty board sales business, which was then grossing them better than $100,000 a year in discounts, to the Mead Board Sales Company and The Mead Corporation, which owned sixty percent of the Mead Board Sales stock, with employees owning the remaining forty percent. The executives and salesmen selected to manage and operate the Mead Board Sales were well versed in the board field, had numerous contacts therein, and were familiar with the Lynchburg mill operation. The Mead Board Sales Company has also been selling similar products made by other mills.

Among the many different papers manufactured by The Mead Corporation was the coated groundwood publication paper made for Life and Time by a machine in the Escanaba Mill from 1948 forward, a different type of publication paper having theretofore been supplied from the Kingsport and Chillicothe Mills of The Mead Corporation. The tonnage of publication paper supplied to Time magazine in 1924 was increased many times by The Mead Corporation up to 1936, when it also supplied publication paper for Life, which in turn, over succeeding years, required many times the tonnage originally supplied.

In the 1930 Charter or Articles of Incorporation of The Mead Corporation, two of its purpose clauses gave The Mead Corporation broad authority to sell its products through other sales organizations.

Section Third, paragraphs (a) and (g), read as follows:

"Third: The purpose or purposes for which it is formed are:

"(a) To manufacture, purchase, or otherwise acquire and to hold, own, **sell or otherwise dispose of,** trade in and deal in paper, wood and straw pulp, paper materials, strawboard, paperboard and paper products of every kind and description; tannic acid and other acid or chemical products.

"(g) **To do any and all things necessary,** convenient or expedient **for the accomplishment of any of the purposes,** or the furtherance of any of the powers **hereinbefore set forth, either alone or in association with other corporations, firms or individuals;** and, in general, to carry on any other business not forbidden by the General Corporation Act of the State of Ohio." (Emphasis by the Court.)

Beginning in 1922 The Mead Sales Company handled a substantial volume of Mead Corporation white paper business, but The Mead Corporation business did not become the most important factor in The Mead Sales Company business until the 1930's, when other paper lines owned by Mead Corporation, such as Wheelwright, Dill and Collins. Moistrite bond papers, and other items, were taken on by Mead Sales, which required more and more time and effort from The Meal Sales Company staff, until in the 1940's the sale of Mead Corporation products became a still more dominant portion of the business of The Mead Sales Company.

During the years from 1940 to 1953 the sale of Mead Corporation products constituted about seventy-four percent of The Mead Sales Company business. The sale of Mead Corporation paper products by Mead Sales Company increased from $754,634 in 1922 to $52,460,538 in 1952.

In 1952 the total sales of The Mead Corporation was $100,304,905. The Mead Sales Company sold $55,769,559 of this amount. The Mead Sales Company sold $21,384,770 of non-Mead products, including pulp and papers, making a total of $77,154,329, in 1952 sales. The Mead Corporation sold over 44% of its own products, or $44,508,346 direct to consumers.

For the thirteen year period from 1940 through 1952, The Mead Corporation sold $801,449,347 of its products either direct to consumers or to The Mead Sales Company. During this same period, The Mead Sales Company sold $631,255,880 of Mead and non-Mead products. Of this amount $465,457,188 was Mead Corporation products, and the remainder of $165,798,692 was non-Mead products. The Mead Corporation sold direct to consumers, during this 13 year period $335,992,159 of its own products, or 42% of its total manufacture.

The Mead Sales Company realized net profits on Mead Corporation business, during the last thirteen years of approximately $1,469,000, an average of approximately $113,000.00 a year. Of the $465,000,000 worth of Mead Corporation products sold by Mead Sales, the average annual net profit amounts to .3% (3/10th of 1%) or 1/3 of .01c on each $1.00 of sales. Trade discounts earned for selling Mead paper during this period averaged 3.88%.

Of the defendants herein four served in high executive capacities in The Mead Corporation and The Mead Sales Company. George H. Mead, after serving as general manager and Vice-President of The Mead Pulp and Paper Company from 1905 to 1912, became President successively of The Mead Pulp and Paper Company and The Mead Corporation, and continued in that capacity until 1942, when he became Chairman of the Board until 1948, and thereafter Honorary Chairman. Sydney Ferguson became a Vice-President of The Mead Corporation in 1930, and continued in that capacity until 1942, when he became President, succeeding George H. Mead. He continued as President until 1948, when he became Chairman of the Board, in which capacity he still serves.

George H. Mead became President of The Mead Sales Company when it was organized in 1921, and continued in that capacity until 1935. Rufus Worrell, who was a Vice-President of The Mead Sales Company from 1925 to 1935, served as President from 1935 to 1949. Warren Kampf became a Vice-President in 1934, and served in that capacity until 1949, at which time he became President, in which capacity he still serves.

With relation to the number, personnel, and stockholdings of the members of the Boards of The Mead Pulp and Paper Company from 1921 to 1930; of The Mead Corporation from 1930 to 1953; and The Mead Sales Company from 1921 to 1953, the following is a summary:

The Mead Pulp and Paper Company had nine Directors on its Board from 1921 to 1930, when The Mead Corporation was formed. The Mead Corporation had fifteen Directors on its Board when it was formed in 1930, and thereafter at various times had as many as seventeen or eighteen Directors up to 1953.

The Mead Sales Company had seven Directors on its Board from 1921 up to 1953, with the exception of several brief intervals when a vacancy was unfilled for a period of months.

The only common Director and stockholder in the two corporations from 1921 to 1930 was George H. Mead. In 1930, Mr. George Mead, President, and Mr. Sydney Ferguson, Vice-President of The Mead Corporation, were directors in both The Mead Corporation and The Mead Sales Company, and continued as Directors in both Corporations until 1937, when Rufus I. Worrell became a Director in both Corporations, along with George Mead and Ferguson until 1948, when Worrell severed his connection with The Mead Corporation Board. Thereafter, in 1949, H. T. Mead became a member of both Boards, and the two Meads, together with Ferguson, continued to serve as members of both Boards until April of 1952, when H. T. Mead and Ferguson ceased to be members of The Mead Sales Company Board.

To summarize, from 1921 to date, four persons have served as common Directors on the Boards of both Corporations. George H. Mead served the entire period and .was the only common Director from 1921 to 1930. From 1930 to 1937 there were two common Directors, Sydney Ferguson and George H. Mead; from 1937 to 1952 there were three common Directors, George Mead, Ferguson, and Rufus Worrell, to 1948; and George Mead, Ferguson and H. T. Mead from 1948 to April of 1952, after which George H. Mead was the only common Director.

There were thirty-three separate Boards of Directors serving The Mead Corporation from 1921 until 1954. Forty-one separate individuals served as Directors. Six of the nine Directors of the Mead Pulp and Paper Company in 1930 continued as Directors in The Mead Corporation. There were thirty-eight separate individual Directors of The Mead Corporation from 1930 to 1953.

There were 22,000 outstanding common shares in The Mead Pulp and Paper Company in 1921. The George H. Mead interests owned 5,148, or 23.4% of the total. The other Directors owned 11,042, slightly over 50% of the total outstanding shares.

In December, 1936, the members of the Board of The Mead Corporation owned a total of 61,929 shares out of a total of 619,374 outstanding, a little more 'than ten percent of the shares outstanding. Of the shares owned by the Board, George H. Mead owned 5,710 and Sydney Ferguson owned 466, a total of 6,176, a little less than ten percent of the total shares owned by the Board.

In April, 1946, the Directors owned 31,482 shares out of a total of 693,613 outstanding, more than 4½% of the total outstanding shares. George H. Mead owned 7,610 shares, Sydney Ferguson 600 shares, and Rufus I. Worrell 528 shares, a total of 8,738, or about 28% of the shares owned by the Directors.

As to The Mead Sales Company, out of a total of 51,648 shares of common stock outstanding January 8, 1954, and somewhat lesser amounts in preceding years the Mead Investment Company (controlled by the Mead family interests), George H. Mead, and other common directors and their families, owned about forty or forty-one percent of the outstanding stock. The remainder or majority of The Mead Sales Company stock was owned principally by officers, directors and employees of The Mead Sales Company and their families, and was acquired through an incentive plan.

During the period from 1930 to 1954, the Boards of Directors of The Mead Corporation reviewed on a number of occasions the question of whether or not The Mead Sales Company should continue to sell Mead Corporation products, and if so what commissions or discounts should be paid for such services. On April 25, 1933, The Mead Corporation Board appointed a committee of five from among its number to investigate and report upon the general sales arrangements of The Mead Corporation and the commissions being paid therefor.

The members of the committee, consisting of H. P. Carruth, Vice-President, C. H. Van de Carr, Vice-President, Sydney Ferguson, Vice-President, Speed Warren, Treasurer, and L. H. Mahrt, Assistant Treasurer, submitted in writing, on December 20, 1933, a report stating that The Mead Sales Company maintained offices in New York and Chicago, in addition to Dayton, and sold the products of companies other than The Mead Corporation through such offices; that if The Mead Corporation sold its own products it would have to maintain offices in both cities, and in so doing would be subject to Illinois and New York taxes, somewhat severe in the latter State. Further, that The Mead Corporation, by selling through The Mead Sales Company, is relieved of the necessity of maintaining a large sales organization, which in times of depressed business would relieve The Mead Corporation of considerable expense; that The Mead Corporation's sales expenses incurred in selling through The Mead Sales varies directly with the volume of sales; that The Mead Sales Company is responsible for all credit risks on all sales, except by special arrangements, which relieves The Mead Corporation from the necessity of maintaining a credit department; that The Mead Sales Company can afford to employ a higher grade of executive personnel than The Mead Corporation could, as it represents other producers of pulp and paper, and handles a considerably larger business than The Mead Corporation; that since The Mead Corporation business constitutes more and more of the total business of The Mead Sales, The Mead Sales is devoting and will in the future devote more effort to developing Mead Corporation sales than in the past; that the over-all selling cost to other companies selling their own products is at least 6% of the sales value of their products, whereas the selling expense of The Mead Corporation from 1930 through August of 1933 averaged about 2.5%; and that the sales by The Mead Sales Company, other than publication sales, for the years from 1929 through the first six months of 1933 increased greatly in 1932 and 1933 over the three preceding years due to the excellent sales job being done by Mead Sales.

After reciting the above advantages, the committee mentioned several disadvantags, namely: That Mead Corporation, by selling through Mead Sales, did not directly control its own merchandising; the committee pointed out, however, that the close personal contact and cooperation between The Mead Corporation and Mead Sales, and the ability of Mead Corporation to supervise the general selling policies of Mead Sales, eliminates this undesirable factor. The committee further found that The Mead Corporation should always have a representative from The Mead Sales Company on its Board of Directors, as had theretofore been the policy. The committee found that the existing arrangement

with Mead Sales was the best available arrangement and should be continued, and that The Mead Sales Company should receive 3% of publication sales and 5% on other sales of paper.

This report was approved by the Board of Directors on April 24, 1934, and the commissions recommended were paid, with the exception of some cases in which the commissions were reduced or not charged at all.

During succeeding years there were several changes by The Mead Corporation Board in the discounts allowed to The Mead Sales, and by 1951 and the two years following, the discount classification had expanded to 3% on groundwood and miscellaneous publication papers, 1% on paper supplied to Time, Inc., and to the United Wall Paper Company, 5% on other white papers, excepting Crowell-Collier Publishing Company, and other miscellaneous exceptions, 3% on soda pulp, with a maximum discount of $2.50 per ton, 3% on Brunswick pulp, with a maximum discount of $3.00 per ton.

The report of The Mead Corporation prepared by Coverdale and Colpitts, industrial engineers of New York City, in 1936, analyzed its corporate and business history, business and products, income statements, balance sheet, sales and distribution, manufacturing, position in the industry, organization and management, and gave their conclusions. Among others, on page 33 in their comment on selling and administrative expenses from 1930 to 1936, they show a low average but an ever increasing sales expense ranging from 1.8% in 1930 to 2.7% in 1936. In their summary on page 34, they state:

"Projection of consolidated net sales from 1936 indicates a volume for this year in excess of $17,000,000—a figure greater than that of any preceding year."

On page 36, the last statement under the general heading of "Income statements" is:

"Selling and administrative costs show a satisfactory relationship to sales volume."

On page 51, under "Sales and Distribution," the report states:

"The Mead Sales Company maintains selling offices and representatives in principal cities, conducts advertising campaigns, and otherwise incurs for its own account the selling expenses in connection with the distribution of Mead products. Thus, other than commissions paid and certain minor sales service expenses, the Mead Company's account reflects no detailed selling expenses."

On page 66 of the summary, under "Sales and Distribution," the report states:

"Mead's principal book paper products are marketed on a commission basis by Mead Sales Company which is corporately non-affiliated and non-controlled. During recent years, sales of the book paper division, in production and distribution, show great improvement with respect to diversification. Diversity has been secured through the acquisition of additional lines now being marketed satisfactorily through jobbers and merchants, and by the development of waxing and other converter's papers sold direct. In this manner the serious preponderance of sales of magazine paper to a few customers has been reduced to a more reasonable production."

On page 127, under the general heading of "Organization and Management," the report states:

"Products of the book paper division, with certain exceptions, together with paper board specialty, are marketed through Mead Sales Company, corporately non-affiliated and non-controlled, on the customary commission basis. Selling costs, consisting principally of commissions and certain sales service expenses, are considered to be satisfactory."

In 1946 the firm of Coverdale and Colpitts again made an extensive analysis and report of The Mead Corporation, including its corporate and business changes, income record, balance sheet, industry position, sales and distribution, manufacturing operation, organization and management, and its conclusions therefrom, so that The Mead Corporation might obtain increased capital through issues of debentures and stock for increased development of its production facilities, and so that it might further diversify its products to meet the demands of the market. In its summary of the sales and distribution of Mead Corporation products, the consulting engineers reported, on page 60, that:

"Mead's arrangements for the marketing of its various products are sound and selling costs are reasonable."

Further, that:

"The general growth in sales volume has been shared in reasonable proportion by each of the company's main product divisions."

In its discussion of sales and distribution the report states:

"The Mead Corporation possesses an option which enables it to purchase control of the Mead Sales Company if it desires. Comparison of Mead selling expenses under its present selling arrangements with those of other paper companies operating their own sales departments indicate that Mead's over-all selling costs are not out of line."

The report, in discussing the comparative earning record of The Mead Corporation, under the general heading of "industry position," from 1935 through 1944, stated, in effect, on pages 50 and 51, that Mead's under-average earning performance was due to three factors, to-wit: That the Kingsport and Wheelwright Divisions were unprofitable operations until 1940-1941; that the high proportion of publication tonnage with its lower sales realization and profit margins reduced the net income during the first few years of the ten year period, and that the OPA restrictive price controls and wartime controls through the war years affected Mead's lower price bases adversely, as its operation was not fully integrated as to pulp supply. Nothing appears in the report under the comparative earning record heading, or in any other part, to indicate that the somewhat low net income of Mead Corporation was in any way due to excessive, unreasonable, or above-average sales costs.

Under the heading of "Income Record" on page 26, the report states:

"Sales of magazine paper to Crowell Publishing Company are handled on a direct basis with no commissions paid. Although regular commission arrangements vary from three to five percent, the substantial tonnage sold to Crowell, together with extract and certain board tonnage sold without commissions tend to reduce the overall selling expense to barely more than three percent. Administrative expense in relation to sales has been consistently low."

Options to purchase 80% of the outstanding stock in The Mead Sales Company were secured by The Mead Corporation in 1936. The options provided for the purchase of the stock at 120% of book value.

During the period from June, 1930 to May, 1953, The Mead Corporation has borrowed and raised a total of $102,550,000, through loans and underwritings. Among the institutions underwriting or loaning such sum were: Lehman Brothers of New York, Drexel and Company of Philadelphia, Harriman and Ripley of New York. The City Bank Farmers Trust Company of New York, First National Bank of Chicago, Northwestern Mutual Life Insurance Company, John Hancock Life Insurance Company, Sun Life, and Massachusetts Mutual Life Insurance Company. These institutions were familiar with the inter-relationships of The Mead Sales Company and The Mead Corporation, the stockholdings of the Directors thereof, together with much other pertinent information concerning the financial affairs and business of The Mead Corporation. Financial institutions supplying capital funds to The Mead Corporation after the options to purchase 80% of The Mead Sales Company stock were executed never criticized the arrangement or suggested any change therein. None of them have requested that the options be either modified or exercised.

Over the years, beginning in 1922 when the Mead Sales Company sold the publication paper that the Crowell Publishing was unable to take under its contract with Mead Corporation, The Mead Sales contributed a number of services to The Mead Corporation without compensation. The Crowell contract was serviced by a Mead Sales executive over the years without cost to The Mead Corporation, and The Mead Sales sold and serviced The Mead Corporation contract with Time, Inc., for a period of four and one-half years without compensation.

The Mead Sales organization, through the various branch offices in the United States, its pulp contacts, and other sources of information, conducted research and surveys over a period of years to determine the demand in the trade and the market for various types of pulp, paper, and paperboard products, and gave such information to The Mead Corporation to assist it in the buying of pulp, and the determination of the type and nature of new products to be made and to give it guidance in the expansion and diversification of its production facilities.

The Mead Sales Company, between the years 1946 and 1952, expended for advertising of Mead Corporation products the sum of $1,103,926, approximately one-half of the total advertising expense which it shared about equally with Mead Corporation.

The sales arrangements between The Mead Corporation and The Mead Sales Company disclose that The Mead Corporation Board at various times fixed the commissions or discounts to be paid to Mead Sales, and The Mead Sales from time to time gave its services in the sale of some products for very little or no compensation, and at other times received for the sale of other products discounts that were considered either standard or somewhat below the standard in the trade. In any event, the compensation received by The Mead Sales Company was not determined by arms length negotiations between The Mead Corporation and The Mead Sales, but was dictated by the Board of Directors

of The Mead Corporation. The sales arrangements between the two companies also required The Mead Sales Company to purchase paper products outright from The Mead Corporation, and to pay therefor three times a month, the 10th, 20th, and 30th of each month. This arrangement required The Mead Sales Company to guarantee and assume all credit risks, except in special situations, which relieved The Mead Corporation of the necessity of maintaining a credit department to service Mead Sales customers. As a result of this arrangement, The Mead Sales Company has assumed losses from 1921 through 1952 totaling $615,000 on sales accounts handled by it for The Mead Corporation.

The growth in volume and diversification in Mead Corporation products, very largely through the efforts of Mead Sales, required The Mead Sales to increase its sales force over the years, particularly in the 1940's and early 1950's, to take care of the expanding merchant, jobber, and other trade. All salesmen employed by Mead Sales received training in the mills of The Mead Corporation for a period of approximately one year, at Mead Sales expense, so that they might better understand the fundamentals of paper production and the problems connected therewith, particularly as they apply to sales, and so that the sales policies and efforts of Mead Sales might be better coordinated with The Mead Corporation production. For instance, accurate day to day and week by week knowledge by Mead Sales representatives of the unutilized capacity of the various machines in the Mead mills making various kinds of paper has made possible the fullest utilization of the capacity of such machines, and as a result, has made and still makes for a more efficient and more economical production of paper, and at the same time gives the customer more definite assurance that it will receive delivery of the quantity and quality of paper ordered at the time designated.

The Mead Sales Company has cooperated in scores of other ways with The Mead Corporation in helping to develop, expand and diversify The Mead production so as to make it a well-balanced paper manufacturing concern, and to eliminate its former top-heavy position as a one-customer mill in the publication paper field.

Mead Sales, in addition to the foregoing, turned over Specialty Board Sales grossing $100,000 per year in discounts to The Mead Board Sales Company and Mead Corporation without compensation.

The Mead Corporation, on the other hand, by purchasing the Dill and Collins and Wheelwright plants and lines, and other plants and lines, giving its time to help train salesmen for Mead Sales, in supplying its own talented personnel to Mead Sales, in sharing advertising costs, and in cooperating generally with Mead Sales, by expanding and diversifying its lines, helped Mead Sales to do a more efficient selling job.

Nothing in the evidence indicates that any of the assets or the moneys of The Mead Corporation became a part of the assets of The Mead Sales Company.

The Mead Corporation securities have been listed for some years on the New York Stock Exchange. The stock holdings of its Directors, in both The Mead Corporation and The Mead Sales Company, together with complete detailed financial information about the company, has been fully set forth in a number of applications for listings, prospect

uses, and registration statements, filed with the New York Stock Exchange and the Securities Exchange Commission from 1937 on. Mead Corporation stockholders received such information four or five times through mailings. The 1946 Prospectus and Application for Listings were furnished plaintiff's brokers, and Moody, Fitch, and Standard and Poor, leading investment services, carried such information about ten years after 1937.

The Mead Corporation had no knowledge of any complaint against it by plaintiff until this suit was filed, as no letter had been written to the company. No other stockholder has registered with The Mead Corporation any complaint of the type made by plaintiff in this case, and the evidence fails to show that any stockholders joined plaintiff in prosecuting this litigation. Plaintiff, a front for others, knows little about her case, and her claims are being asserted by her counsel.

## DISCUSSION OF ADVERSE CLAIMS

Plaintiff claims that she has proven five things:

First: That The Mead Sales Company, except for pulp, is, and operates as, a division of The Mead Corporation, whose corporate selling function The Mead Sales Company has appropriated and performed, and whose sales profits Mead Sales Company has diverted.

Second: That The Mead Sales Company business was developed in part with the assets, personnel, and actions of The Mead Corporation.

Third: That The Mead Corporation had the opportunity, the skill, and the assets, with which to develop a sales organization as a division or subsidiary of The Mead Corporation.

Fourth: That the separation of ownership has been costly to Mead and beneficial to the Mead personal interests.

Fifth: That George H. Mead, the most influential and only Director in both companies for the entire period from 1921 through 1953, dominated and controlled the Boards of Directors and the affairs of Mead Corporation to the extent that the Directors failed to set up their own sales organizaion between 1932 and 1936, failed since 1936 to have the options to purchase modified and then exercised, and as a result have been guilty of gross negligence and bad faith in permitting a diversion of profits to Mead Sales.

However, plaintiff, in effect, has practically abandoned her claim of gross negligence against The Mead Corporation Boards, and has substituted therefor the claim that George H. Mead, as a representative of The Mead Corporation Board and the dominating common Director has expressly charged himself with and assumed for The Mead Corporation and its Boards the general fiduciary obligation of acquiring and using the substantial stock interest of the Meads in the Sales Company for the benefit of The Mead Corporation.

Plaintiff claims that George H. Mead, through his statements and conduct from 1921 to date, made himself the express or constructive Trustee of The Mead Sales stock held by the Mead interests for the benefit of The Mead Corporation, and plaintiff requests the Court to order such stock interest transferred to The Mead Corporation, compensation being made for the capital invested therein, less dividends, such transfer being requested on the theory that the Court, in equity, has the right to modify

and require the exercise of the options to satisfy and discharge the Trust.

As to plaintiff's first claim, there is no question that The Mead Sales Company operated as if it were a division of The Mead Corporation, and in close integration and cooperation therewith.

The evidence is replete with examples of care exercised by George H. Mead and the officers of The Mead Sales Company to make the policies and practices of The Mead Sales Company harmonize with and conform to the policies and practices of Mead Corporation, so that high quality paper products could be manufactured and sold with greater efficiency and economy.

However, with relation to plaintiff's claim that The Mead Corporation Articles of Incorporation, together with amendments, required The Mead Corporation to exercise its sales functions through its own organization, and that any alienation of that function by The Mead Corporation, or any appropriation thereof by any other sales organization, was improper, the evidence amply shows that this is not the case, as the Articles of Incorporation affirmatively authorize Mead Corporation to sell or otherwise dispose of paper, paper board, paper products, etc., of every kind and description, either alone or in association with other corporations, firms, or individuals. So it cannot be said that The Mead Sales Company wrongfully appropriated a corporate function belonging exclusively to The Mead Corporation, although it was exercising a function that The Mead Corporation had the right to exercise and did exercise as to 42% of its Dollar production during the thirteen years from 1940 through 1952.

There being no wrongful appropriation of the Mead Corporation Sales function, it follows there is no wrongful diversion of profits by Mead Sales in merely performing or assisting Mead Corporation in performing part of its sales function.

As to plaintiff's second claim, there is no question that The Mead Sales Company business was developed in part through the investment by Mead Corporation in other companies and products, in new equipment and properties to expand and diversify its productive capacities, but Mead Corporation assets were not turned over to nor invested in Mead Sales. Nor is there any question that some able personnel came to Mead Sales from Mead Corporation at Mead Sales expense; nor is there any question that Mead Corporation board actions and policies assisted Mead Sales in increasing sales of old and new Mead Corporation products, all of which increases were in the self interest of Mead Corporation, as well as Mead Sales.

As to plaintiff's third claim, there is no question that Mead Corporation had the general opportunity, the assets, or the means of securing the assets, and the ability, if it so elected, to develop a functioning sales organization; but whether or not a situation ever developed making the organization of its own sales division feasible or desirable is doubtful, as hereinafter detailed.

Plaintiff's fourth claim that the separation of ownership has been costly to The Mead Corporation and beneficial to the Mead personal interests, requires consideration. In support of this claim plaintiff contends

that The Mead Corporation, through a sales force of its own, or through a wholly owned sales company, could have sold Mead Corporation products at higher prices, at lower cost to The Mead Corporation than those realized by Mead Sales, and with very little or no sales effort; further that leading manufacturers of comparable paper products all have their own sales division or wholly owned subsidiaries.

There is absolutely no evidence that The Mead Corporation paper products sold by Mead Sales could have been sold by Mead Corporation, or any other paper sales organization at higher prices than those actually realized.

As to plaintiff's claim that sales required no effort, the evidence amply shows the contrary was true. For instance, much skill and perseverance over many years was required to develop the large number of jobber outlets for bond papers and other products, and the servicing of the large publication contracts required constant attention from Mead Sales executives.

With relation to Mead Corporation setting up its own sales division, the question arises as to when and why plaintiff feels such action should have been taken. The evidence shows that The Mead Sales Company did an outstanding selling job of Mead paper products. In 1932 and 1933, during the Depression, when other mills were selling much less in proportion, the Mead tonnage sold in 1932, 40,832 tons, increased 10% over 1931. The Dollar volume of sales for 1933 increased 20% over 1932; for 1934 about 10% over 1933; for 1935 more than 20% over 1934; for 1936 37% over 1935; for 1937 34% over 1936. The Dollar volume in 1937 was $10,221,135. There was a decrease in Dollar volume in 1938 of about 27½%, and in 1939 an increase of about 27%. Would plaintiff have required Mead Corporation to take over its sales in 1932 or 1933 in depression years, or in 1934 when its committee investigating Mead Sales reported favorably, or in 1936 when Coverdale and Colpitts reported favorably on the sales arrangement, or at the high point in 1937, when Mead Sales was enjoying considerable success, or would 1938 have been the proper time, during a minor Depression? Their increase in 1939 over 1938 was almost as great as the increase of 1937 over 1936. How long would have been required to build such a sales organization? Would they have been able to offer incentives and opportunities comparable to Mead Sales? How many would have been employed? What training would they have received? Would they sell to the same trade as The Mead Sales Company, and perhaps in competition therewith? What volume of business would have been done? And to what extent would such volume keep The Mead Corporation machinery moving?

There are many other speculative considerations too numerous to mention. Suffice it to say that the evidence wholly fails to show that it would have been feasible for The Mead Corporation to organize its own sales division prior to 1936, when the options to purchase were executed. After the execution of such options, the evidence shows that if, as a matter of policy, The Mead Corporation wanted to completely control its sales organization, the only feasible plan would have been to exercise the options and acquire eighty percent or at least a majority of The Mead Sales stock. However, a number of considerations

have justified Mead Corporation in not exercising its options in the last seventeen years, chief among them being the outstanding success of The Mead Sales Company in vastly increasing the over-all volume and diversity of Mead products sold at a reasonable sales cost. In spite of the existing practice of comparable mills having their own sales divisions, the Mead experience with Canadian mills and mills of The Mead Corporation shows a closely integrated independent sales organization may be just as successful.

Since The Mead Corporation advanced from the position of a small mill in 1906, about one-fifteenth or one-twentieth the size of leading companies now having their own sales divisions or subsidiaries, such as the West Virginia, Crocker-Burbank, Kimberly-Clark, New York and Pennsylvania, Oxford, Champion, and S. D. Warren, to its present position as one of the three top book paper manufacturers in the country, ranking alongside the Champion and the Oxford, it would seem that no reasonable person could conclude that The Mead Corporation would have developed into a bigger, more efficient and more diversified business through its own sales organization. In fact plaintiff has not undertaken the burden of proving that the sales policy of The Mead Corporation disposing of a substantial portion of its products through Mead Sales has prevented or inhibited the growth and development of The Mead Corporation.

The mere fact that The Mead Sales Company has netted an average of about $113,000.00 a year from 1940 to 1952 on Mead Corporation business (about 3/10ths of 1% on $465,000,000 volume), does not prove that The Mead Corporation, had it operated its own sales division, would have made such amount of money in addition to the net profit realized by it without its own sales organization. Mead Corporation would probably have required additional capital and made provision for a fair return thereon to set up its own sales division. In addition, Mead Corporation would have had to invest in some incentive plan comparable to that of The Mead Sales, and incur other expenses which it did not incur, before it could have realized any profit or segment of profit from the efforts of its own sales organization.

Certainly the various Boards of Directors of The Mead Corporation would have been taking a serious risk had they authorized the transfer of their sales from The Mead Sales Company to the Mead Corporation, as The Mead Sales Company was meeting with considerable success in expanding the business of The Mead Corporation between 1932 and 1940, particularly in 1937.

Any criticism of the policy of The Mead Corporation Boards permitting Mead Sales, an independent corporation, to market a substantial portion of Mead Corporation products, without some adequate safeguard to protect Mead Corporation interests against possible hostile business policies and practices, that might have been advanced prior to 1936, was eliminated to the satisfaction of the large financing institutions and organizations named herein by Mead Corporation taking options in 1936 to purchase eighty percent of The Mead Sales Company stock at 120% of the book value. Since such institutions raised or advanced approximately $102,000,000 from 1937 to 1953, to finance the ex-

pansion of The Mead business, they must have been convinced that the options to purchase The Mead Sales stock, together with the closely integrated management of the two companies, and other factors, afforded sufficient protection without requiring Mead Corporation to exercise its options.

From the foregoing it follows that The Mead Corporation would probably not have fared as well as it has, had it organized its own sales division, and probably no better than it has fared had it exercised its options. The Mead Corporation has suffered no losses from The Mead Sales handling of their products, but on the contrary have greatly benefited thereby.

As to plaintiff's fifth claim that Mr. Mead's domination of The Mead Corporation Boards permitted Mead Sales, through the influence of Mr. Mead and other common Directors, to divert from 1921 to date the sale of Mead products and profits therefrom, and that Mr. Mead's own statements and conduct with relation thereto makes him an express or constructive Trustee of Mead Sales stock owned by the Mead interests for the benefit of Mead Corporation,—plaintiff now admits that there was no wrongful diversion of Mead Corporation profits by the Mead Sales Company from 1921 through 1932, and further that no plan was conceived or put into execution in 1921 when Mead Sales was formed to divert profits from Mead Corporation.

Plaintiff claims, however, that between 1932 and 1940 the continuation of the selling of Mead products by Mead Sales amounted to a wrongful diversion of business opportunities and profits from the Mead Corporation. Plaintiff does not press the claim that there was a continuing conspiracy during such period, and does not fix the time the alleged wrongful diversion began.

Plaintiff's position with relation to Mead Corporation products being sold by Mead Sales before and after 1932 is set forth in the opening statement and principal brief of plaintiff's counsel.

In his opening statement, plaintiff's counsel states:

"* * * At that time (1921) no one can object to the acts and formation of this company.

"But to discuss our claims, we are claiming that at that time, beginning in 1932, probably was the time to make the decision to put the function of selling Mead paper into Mead's hands."

In his Brief, at page 64 and 65, plaintiff's counsel states:

"Prior to 1932, what sales which were turned over to The Mead Sales Company were conceived of as temporary, or of insignificant volume. We doubt whether any strong criticism can be asserted for permitting these sales to be handled even at a profit, by The Mead Sales Company."

On page 67 he states:

"Experimentally, perhaps, the diversion was proper. However, at some point after that time, when the experiment proved a large and important element of Mead's business—was the time to switch sales to The Mead Corporation, since this was the beginning of important diversion of profits and each year since the determination to continue the situation was equally wrong."

These statements are an admission that the arrangement between

The Mead Corporation and Mead Sales was in good faith for ten years, or until 1932.

It is difficult to understand why a continuation and a successful development in the over-all volume and the number of lines of Mead Corporation's white paper business would per se at some point between 1932 and 1940 suddenly or gradually become tainted, and become transposed from good faith to bad faith. The claim of transposition to bad faith is apparently founded on the fact that The Mead Sales Company successfully increased the volume of sales on old and new white paper lines to the point where such volume became an important part of The Mead Corporation business. We are at a loss to understand how bad faith can be directly correlated with and arise out of an increasing and important volume of business.

Certainly if the relationship was not wrong in the beginning, and was not wrong during the first ten year period, it could not have become wrong later on by reason of a mere increase in volume, as long as the discounts received by The Mead Sales were fair and reasonable, as judged by the standards of the trade, and the sales cost to Mead Corporation was no greater than Mead Corporation would have sustained had it had a sales division of its own.

The facts show that average discounts earned by Mead Sales were generally somewhat lower than the standards of the trade, and at times were very much lower. The Mead Corporation committee reporting on discounts and Coverdale and Colpitts, business analysts, stated that the sales costs to Mead Corporation from 1929 to 1946 were either lower than or in line with sales costs to comparable paper producers having their own sales divisions. At times and on some grades the discounts charged on Mead business by Mead Sales were lower than on comparable grades on non-Mead business, although generally the discounts were the same.

We have heretofore considered in detail whether or not The Mead Corporation should have organized its own sales division, and have found that such an effort would not have been feasible between 1932 and 1936.

We have likewise disposed of plaintiff's claim that the options to purchase Mead Sales stock should have been exercised, by finding that The Mead Corporation would have probably fared no better had it exercised its options, and has suffered no losses by not electing thus far to do so.

As to plaintiff's claim that Mead Corporation's options to purchase Mead Sales Company stock was on unfair and unjust terms, which Mead Corporation Directors failed to have modified,—there is no evidence to show that 120% of the book value was unfair. The presumption is that such price was fair. In any event this Court is without authority, under the pleadings and issues in this case, to order a modification.

With reference to plaintiff's claim that George Mead has dominated and controlled The Mead Corporation and its Boards of Directors, there is not a shred of direct or circumstantial evidence showing domination and control. Such claim, in fact, is contrary to the evidence.—

**First:** Because a number of the forty Directors, as well as George Mead, who served substantial terms on The Mead Corporation Board,

have been and now are nationally known for their extensive experience and knowledge of various phases of industry and business, some of them in the paper field. A number of others have had extensive business and industrial experience in this part of the country, and are well and favorably known in the Miami Valley. George H. Mead's long experience and outstanding leadership in the over-all phases of Mead Corporation business, made his judgment and opinions as to policy and practice respected and influential among this group. However, there is no evidence whatsoever that Mr. Mead ever used, or attempted to use, his influence improperly, and there is no question that the Directors with whom Mr. Mead dealt were of such high business caliber and good reputation as to integrity that they exercised their honest and independent judgment in evaluating The Mead Corporation policy of selling through Mead Sales, and in fixing the rate of discounts.

**Second:** Because it is highly improbable, in fact contrary to human experience, to assume that the overwhelming majority (8 out of 9) of the Board of The Mead Corporation, owning in 1921 11,042 shares, more than 50% of the 22,000 outstanding shares of stock as compared with 5,148 shares owned by the George H. Mead interests (about 23.4% of the total shares outstanding), would plan and conspire among themselves and with George H. Mead to divert profits rightfully belonging to The Mead Pulp and Paper Company to The Mead Sales Company, that is, to take the money out of their own pockets and place it in the pockets of the Mead interests and other stockholders in The Mead Sales Company. During the entire thirty-two ensuing years the overwhelming majority of the thirty-two Boards of Directors had substantial stock holdings in The Mead Corporation, though proportionately less than in 1921. The same reasoning applicable to the 1921 Board applies to them as to their financial self interest.

Under such circumstances, it cannot be assumed, in the absence of proof, that George H. Mead or Sydney Ferguson, Rufus Worrell, or H. T. Mead, attempted from time to time to dominate and control the other eight to fifteen Directors (37 in all), or that any one or a majority of the members of the thirty-three Boards of Directors were at any time in the thirty-three years dominated or controlled by George Mead or the other three common Directors in the sense that such Mead Corporation Director or Directors failed to exercise honest, independent judgment, or were rubber stamps.

Plaintiff claims that the ownership by George Mead and his family of 40% of Mead Sales stock was evidence of domination of the Mead Corporation and its Boards. It might be some evidence bearing upon the extent of his control of The Mead Sales Company, but as to The Mead Corporation and its Directors, such stock ownership was an assurance that Mr. Mead would protect the interest of The Mead Corporation in Mead Sales policies and practices. This was not domination but merely the discharge of a fiduciary duty to protect the interests of The Mead Corporation and its stockholders.

The evidence, failing to show any gross negligence or bad faith on the part of Mead Corporation's Board of Directors, has narrowed down the claim of plaintiff's counsel to an alleged express trust, declared by

George H. Mead in good faith, or an alleged constructive trust charging Mr. Mead as a trustee ex maleficio of The Mead Sales stock owned by the Mead interests. In support of this plaintiff depends on the following testimony of Mr. Mead:

"Now, my interest primarily is not financial; it is in the perpetuation of this company, and any interest I may have in the sales company is incidental, any financial interest. I think if the figures were carefully analyzed that the value of the stock my family has in the Corporation is far in excess of the stock in the sales company. Of course the Corporation has grown rapidly, and my interest has not increased with the Corporation because I could not afford to have it do so. My interest in the sales company was taken as protection to the Corporation through me, so the sales company would at all times be properly directed in policy matters. That's the reason I am Chairman of the Policy Committee, the Executive Committee. (We call it the Policy Committee.) So there can be no question in anybody's mind, if I am permitted to say so, as to the relative interest I have in these two undertakings, and if it is to the best interest and judgment of the people for whom I am serving that the sales company should be owned by the Corporation, I shall do everything in my power to cooperate to that end."

In considering this statement, and particularly the last sentence thereof, it should be remembered that there is no evidence showing any domination or control by Mr. Mead of any one or more members of any Mead Corporation Board, nor is there any evidence that the common Board members of The Mead Corporation and The Mead Sales Company planned or conspired among themselves or with any other member or members of The Mead Corporation Board to divert profits.

When Mr. Mead's above statement is considered in connection with his other testimony, and the evidence as a whole, it indicates he felt a paramount obligation to perpetuate and serve the best interests of The Mead Corporation, and that it was his duty to have a financial interest in Mead Sales so he could protect the Mead Corporation interest particularly as to matters of policy. He states in effect that his interest in Mead Sales is incidental, and that if it should be determined by the Directors of The Mead Corporation as a matter of policy that the Mead Sales Company should be owned by The Mead Corporation, he would cooperate fully to bring about that result. This statement reflects a sense of responsibility on Mr. Mead's part as an individual and as a Director of Mead Corporation acting in a fiduciary capacity for the welfare of The Mead Corporation, and indicates a conscientious desire to do everything in his power to bring about ownership of The Mead Sales Company by The Mead Corporation, should the Directors so determine in the future.

In making such statement he did not intend to acknowledge, nor did he acknowledge, any wrong doing on his part or on the part of any common Director or other Director and stockholder of either company. His statement is neither the declaration of an express trust in good faith, nor an admission of a constructive trust ex maleficio, nor evidence of either.

In this connection it must be remembered that there is no evidence

that any Mead Corporation assets or monies were used by The Mead Corporation, or by the Mead interests, to buy The Mead Sales stock now held by the Mead interests.

The evidence shows that George H. Mead invested about one-half Million Dollars capital in Mead Sales Company at the out-set, and there-after continued to invest further funds in Mead Sales, for which he received stock. All together, about two and one-half Million Dollars capital has been invested in Mead Sales. Officers and employees, their families, and persons other than George Mead, and the Mead Invest-ment Company, own approximately sixty percent of the stock, which represents their investment in the Mead Sales Company. Obviously George H. Mead, and other Mead Sales stockholders, are entitled to a fair return on their investment.

The evidence fails to show that Mead Sales net profits from Mead Corporation business over the period from 1940 through 1952 were large enough from year to year to provide any more than a fair return, par-ticularly as Mead Sales retained some of the net profit in their business. Mead Corporation consequently has no interest in Mead Sales stock other than its right to exercise its options to purchase 80% of such stock.

Mead Sales Company is under no duty to account to Mead Corpora-tion or its stockholders for any of its net profits from Mead Corpora-tion sales, as none of such net profits were tainted by any fraudulent dealing, bad faith, or wrongful diversion or appropriation of Mead Cor-poration business. Such profits not being tainted, neither were the dividends from such profits received by Mead Sales stockholders tainted by any wrong doing on the part of any defendant.

Counsel for plaintiff, in urging the advisability of The Mead Cor-poration owning a controlling interest in The Mead Sales stock, com-bines the trust and modification and exercise of option arguments, to induce the Court to do indirectly what it has no right to do directly; namely: To require the modification and exercise of the options to pur-chase the Mead interest stock. Since none of the Mead Sales stock was purchased or acquired by or through the use of Mead Corporation as-sets, and none of the dividends were tainted by any fraud, bad faith, or wrongful diversion of profits, obviously the Mead interests are entitled to retain ownership of their stock, and the dividends and proceeds there-from, the same as any other stockholder in Mead Sales.

Mr. Mead, as a representative of The Mead Corporation Boards of Directors over the years, assumed for the Board the responsibility of seeing to it that Mead Sales functioned efficiently, and in the best in-terest of Mead Corporation at a reasonable cost. Mr. Mead has fully discharged this responsibility. There has been no breach of any fiduciary duty owing by him or any other members of Mead Corporation Boards. There has been no bad faith, but on the contrary, the utmost good faith. The Court could not possibly require more of Mr. Mead than he has done.

It follows that the Court has no authority to require the Mead in-terests to submit to a modification and exercise of the Mead Corporation's options to purchase their stock under the pretense that the stock was held in trust. The fact that Mr. Mead chose stock ownership in Mead

Sales as a means of seeing to it that the fiduciary obligations of the Mead Boards to the Mead . Corporation and stockholders was being discharged through him does not charge the stock with a trust, express or implied, the stock being only a means through which the fiduciary duty was discharged.

The combining of the modification and exercise of the options argument with the trust argument in no way creates a trust where none existed before. Since neither position is tenable independent of the other, they are no more tenable when urged jointly. These arguments can have no standing in a Court of law, and should be addressed to the Board of Directors of The Mead Corporation as bearing on the question of whether or not the Directors should exercise the outstanding options to purchase Mead Sales stock.

The Court has considered matters of policy only as such matters relate to plaintiff's claim of gross negligence and bad faith by Mead Corporation Directors in not setting up its own sales division or taking over Mead Sales. Having found there was no gross negligence, fraud, or bad faith, the Court may not judicially determine the policy or policies The Mead Corporation Boards of Directors shall follow as to sales. Such determination is their exclusive province. It is well established that matters of corporate policy are to be determined entirely by the Directors, and unless there is a gross abuse of discretion, fraud, gross negligence, or wilful or wrongful dissipation or waste of corporate assets, Courts will not interfere.

Plaintiff's amended petition raised the general question as to whether or not defendants, through the defendant Mead Sales Company, appropriated business opportunities belonging to Mead Corporation, more specifically the sales opportunities which plaintiff claims The Mead Corporation should have exploited through its own sales division.

The Court has found that Mead Sales did not unlawfully appropriate the sales function belonging to Mead Corporation, as the Mead Corporation Charter authorized and permitted it to sell its products through other corporations. However, there are some additional considerations bearing on the question of whether or not defendants appropriated sales opportunities that Mead Corporation should have exploited through its own sales division.

The evidence is full of examples of mutual helpfulness and cooperation between the two companies in developing, expanding, and diversifying Mead production to serve a growing jobber, merchant, publication, and other trade. The evidence discloses several examples of Mead Sales performing valuable sales and supervisory functions on publication contracts without charge to Mead Corporation, and two outstanding examples where Mead Corporation gained from Mead Sales without charge many new customers of the Frazer Paper Company and a $100,000 a year paper board specialty business for its subsidiary, Mead Paper Board Sales.

The evidence amply shows that the closely integrated operations of the two companies were efficient, economical, and profitable to Mead Corporation, and that the great organizing and sales ability of George H. Mead was the most important single factor in producing this result.

The evidence shows without conflict that The Mead Corporation owns

and controls all brand and grade names of its paper products sold through Mead Sales, and the registered trade marks therefor, and that the Mead Sales Company does not own or control any separate brand or grade names of Mead Corporation paper products, nor any registered trade marks therefor.

The opportunity offered The Mead Corporation to set up its own sales division up to 1936, when it procured the options to purchase 80% of Mead Sales stock, was a continuing one which the Mead Board of Directors considered from time to time and took no action on, due to the closely integrated and successful performance of a part of the sales function by Mead Sales at a reasonable cost.

The judgment of the Directors was based on conditions and circumstances existing at the various times the matter came before them for consideration. It is doubtful if majorities of the Boards up to 1936 could have reasonably anticipated that Mead Corporation would do a Hundred Million Dollar business in 1952, or even half that amount in the 1940s. They acted reasonably on the basis of the known facts, and no gross negligence, abuse of discretion, or bad faith on their part has been shown, as hereinbefore detailed.

The development and exploitation of sales opportunities for Mead products through Mead Sales has been and is an exploitation principally for the benefit of Mead Corporation, and incidentally for Mead Sales, so it can be properly said that there never has been an appropriation or taking away from Mead Corporation of even a part of the sales opportunities.

The Mead Corporation has the general authority through its Charter to sell its products through other corporations, and the proper exercise and delegation of such authority to another corporation could not constitute a wrongful appropriation by such corporation of The Mead Corporation sales functions. The Mead Corporation retains control of its entire sales function, though a portion of such function has been and still is lawfully delegated to Mead Sales. If and when The Mead Corporation Board elects to exercise its options to purchase a majority of the stock of The Mead Sales, then the entire control, development and exploitation of the sales opportunities of The Mead Corporation will rest in the Mead Corporation.

Aside from the sales function there is no evidence whatsoever that defendants, through Mead Sales, ever appropriated to their own use and benefit and to the exclusion of Mead Corporation any business opportunities of any kind presented to Mead Corporation, but that on the contrary Mead Sales gave extensive assistance, as hereinbefore detailed, to Mead Corporation in realizing on new business opportunities. In this respect Mead Sales worked for the best interest of Mead Corporation to help develop and diversify its business.

Plaintiff also claims in her Amended Petition that she made no demand on the Directors of The Mead Corporation to bring this action, for the reason that all the members of the Board in June 1953 had participated in the actions complained of, and that demands made on them would have been futile and unavailing.

The evidence wholly fails to show that any one or more members

of the Board of Directors participated in any wrongful acts charged, and wholly fails to show that any proper demands or requests made on the Corporation in writing for action would have been unavailing.

The Court, in disposing of the claims made by plaintiff in her amended petition, the evidence, and through the statements and briefs of her counsel, has utilized at some length the factual arguments presented by counsel for defendants.

Defendants, through counsel, have submitted to the Court in the evidence comprehensive, detailed, and complete disclosures of the facts related to the issues in this case to show their good faith in all their dealings under inquiry. They have not insisted upon their position that this suit was not brought in good faith by plaintiff, nor have they insisted upon their position that plaintiff did not make proper demands upon the Board of Directors of The Mead Corporation as a condition precedent to filing this action. They have not waived either position, but have requested the Court to review the facts and law of the case on the merits.

They have likewise brought to the Court's attention the fact that if the evidence fails to show any gross negligence, gross abuse of discretion, or bad faith, on the part of Mead Corporation Boards of Directors that this Court has no right to substitute its judgment and discretion for that of the Board of Directors; but defendants thereupon invite the Court to consider and review the factors affecting and influencing the judgment of the various Boards of Directors, so that the Court might determine the reasonableness or unreasonableness thereof in light of the facts and circumstances then existing. Assuming that a duty existed on the part of defendants to make a full disclosure of all facts relating to the issues to show their good faith, the defendants have discharged such duty.

Adopting the reasoning hereinbefore set forth, we agree with defendants that the evidence establishes the following propositions:

**First**: That the Mead Sales Company was legitimately organized in 1921 for the principal purpose of selling pulp, and at that time there was no intention whatsoever on the part of the original incorporators, officers, directors, and stockholders to sell paper manufactured by Mead Corporation.

**Second**: That the contractual arrangement between the Mead Sales Company and The Mead Corporation to sell surplus publication paper that Crowell Publishing Company could not use was in good faith and was morally and legally above reproach.

**Third**: That the continuation of the contractual relationship between Mead Sales and Mead Corporation for approximately thirty years was not tainted with any fraud or bad faith, and was morally and legally clean, and that the contractual arrangement and the discounts paid thereunder as compensation to The Mead Sales were fair, reasonable and in line with costs to comparable companies.

**Fourth**: That since the business relationship between Mead Corporation and Mead Sales was clean and in good faith, this Court has no right to substitute its judgment for that of the Boards of Directors of The Mead Corporation.

**Fifth:** That since all relationships, arrangements and dealings between the two companies were in the utmost good faith, and since no loss has been sustained, no relief should be granted plaintiff.

As has been suggested by counsel for defendants, the record amply shows that plaintiff is really limiting her request for relief to the claim that Mead Corporation should own a substantial block of stock in Mead Sales for purposes of control and dividend participation, and that Mead Corporation should pay the Mead interests therefor. No general accounting is requested. This is practically a concession that no taint attaches to any net profits from Mead business. As stated above, plaintiff's request should be addressed to the Mead Corporation Board, not to this Court.

## LAW

As to the law applicable to this case, plaintiff cites the following statement from Fletcher on Corporations, Volume 3, paragraph 884, page 268, which reads:

"Directors and other officers of a private corporation cannot either directly or indirectly in their dealings on behalf of their corporation with others or in any other transaction in which they are under a duty to guard the interest of the corporation, make any profit for themselves or acquire any other personal benefit or advantage, even though such officer or director may own practically all of the stock of the corporation, and if they do so, they may be compelled to account therefor to the corporation in an appropriate action."

Some types of transactions covered by this principle involve contractual relations between a corporate officer and a corporation, which are held by some courts to be voidable at the election of the corporation merely because of the relationship of the parties, without regard to whether the contract was fair or unfair, or whether the officer acted in good faith or bad faith. However, other courts regard such contracts as not voidable where the officer acts in good faith, and the transaction is fair to the corporation. However, the dealings of directors with the corporation are closely scrutinized, and when their contracts or engagements with the corporation are challenged, the burden is on the director to prove the good faith of the transaction and its inherent fairness to the corporation and the stockholders.

However applicable the above quoted rule may be in some states to the relationships between individual directors and officers with the Corporation, the general rule applicable to dealings between two corporations having common or interlocking directors is well stated in 114 A. L. R., page 299:

"The general rule seems well settled, without dissent, that, in the absence of statutory prohibition, a contract between corporations having common directors or officers is not void, but voidable only, and, according to the majority of the cases, can be avoided only where unfair dealing or fraud, actual or constructive, is shown, whereby one of the corporations sustains a detriment to the advantage of the other."

Obviously the above general rule is more liberally construed in favor of the common directors and officers of two or more corporations when they constitute a minority only.

The Ohio rule applicable to contracts entered into by two corpora-

tions having several common or interlocking directors constituting a minority of both directorates holds that such a contract is neither void nor voidable from the mere circumstance that a minority of the Boards are common interlocking directors.

In the leading case of **U. S. Rolling Stock Company v. The Atlantic and Great Western Railroad,** which is still the law of Ohio, 34 Oh St 450, the Court states at **page 466:**

"We have not, upon the most diligent research, been able to find a case holding a contract made between two corporations by their respective boards of directors invalid, or voidable at the election of one of the parties thereto, from the mere circumstance that a minority of its board of directors are also directors of the other company. Nor do we think such a rule ought to be adopted. There is no just reason, where a quorum of directors, sustaining no relation of trust or duty to the other corporation, are present, participating in the action of the board, why such action should not be binding upon the company, in the absence of such fraud as would lead a court of equity to undo or set aside the transaction. If the mere fact that a minority of one board are members of the other, gives the company an option to avoid the contract without respect to its fairness, the same result would follow where such minority consisted of but one person, and notwithstanding the board might consist of twenty or more. In our judgment, where a majority of the board are not adversely interested, and have no adverse employment, the right to avoid the contract or transaction does not exist without proof of fraud or unfairness; and hence the fact that five of the defendant's board of directors were members of the plaintiff's board, whatever may have been its effect on the defendant's right to disaffirm or repudiate the contract, if exercised within reasonable time. did not disable the defendant from subsequently affirming the contract, if satisfied with its terms, or rejecting it if not."

The Court has found that George H. Mead was the only common or interlocking director in the two companies from 1921 to 1930, after which there were two until 1937, after which there were three through 1952, after which there was one to date. Mead Sales had seven directors from 1921 through 1953. Mead Pulp and Paper had nine directors from 1921 to 1930, and Mead Corporation had from fifteen to eighteen directors thereafter to date. The Court has found no evidence of domination and control of The Mead Corporation Boards by George Mead, or other common directors. The evidence wholly fails to show that George Mead usurped any one or more of the functions of The Mead Corporation's Boards of Directors. On the contrary the Board members, men of experience in business and industry and of good character and reputation for integrity, exercised their independent judgment in good faith.

Blaustein v. Pan American Petroleum and Transport Company, 263 Ap. Div. 97, states at page 122:

"Determination of domination may not rest merely in the fact that there was an interlocking directorate, especially where, as here, at no time was there a majority of Indiana interlocking directors on Pan Am's board and the directors acting in good faith did not personally profit in any way in the transactions in question . . . . Plaintiffs have

failed to establish by a preponderance of the credible testimony that Indiana, as majority stockholder, so usurped the functions of the Board of directors of Pan Am in the transactions attacked that they failed to exercise their independent judgment in good faith . . . ."

Blaustein case affirmed 293 N. Y. 281, 302.

"We find no evidence which justifies the conclusion that Indiana so dominated the affairs of Pan Am and the official acts of the defendant directors as to impair the free exercise of honest, independent judgment by those directors."

Also Levenworth v. Chicago, etc. Railway Company, 134 U. S. 688, which at page 705 states:

"Nor will it be presumed that if he was even then in the employment of the Rock Island Company in other matters he did not or would not faithfully represent the Southwestern Company in this matter; and his character repels any such inference."

United Milk Producers Corporation v. Lovell, 75 Fed. (2d) 923 at 927:

"Conspiracies are hatched in the dark, and sinister purposes are more readily achieved when time permits neither inquiry nor deliberation to thwart them. There was here neither secrecy nor haste. Before the plan was submitted formally to the stockholders, some eighteen of them, holding approximately 50% of the preferred stock, were consulted."

There is no showing that the vote of George Mead, or the vote of any other common director was necessary to constitute a majority in approving the Mead Corporation committee report on Mead Sales in 1934, or any discount agreement or arrangement between Mead Corporation and Mead Sales, or on any other matter of business practice or policy between them. As herein detailed before, there was no unfairness or bad faith in any transaction between the two companies.

The defendant common directors and the other defendant directors and stockholders in each corporation gave their undivided loyalty to the welfare and best interests of The Mead Corporation. Mead Corporation officers and directors made decisions in all matters where their interests were adverse to Mead Sales, such as discounts, and dictated such decisions to Mead Sales.

In view of the fact that defendants have made a full disclosure of the facts and circumstances of the relationships between the companies, and between the individual defendants and the companies, which show the utmost fairness and good faith, this Court has no legal right or authority to disturb that relationship.

The proposition that bad faith is not established by proof that less than a majority of Mead Corporation Directors were personally interested as Directors or otherwise in the Mead Sales Company has been upheld not only in the United States Rolling Stock Company case, supra, but also in the case of **Wick v. Youngstown, 46 Oh Ap 253,** at **pages 275 and 278:**

"It does not appear any place in the evidence that Mr. Dalton was not entirely fair in all his dealings between these two companies . . . ."

"It is urged that because Mr. Dalton was a common director and had contracts with Bethlehem, the burden was on the defendants to prove that there was no fraud or no unlawful effort on the part of Mr. Dalton to dominate the sale. We think the question was disposed of in this

state in the case of United States Rolling Stock Company v. Atlantic and Great Western Railroad Company. The third proposition of the syllabus of that case reads:

"'A contract made between two corporations through their respective boards of directors, is not voidable at the election of one of the parties thereto, from the mere circumstance that a minority of its board of directors are also directors of the other company.'"

There is no presumption in Ohio that dealings between two corporations having minority, interlocking directors are fraudulent. At most the contracts and transactions between the corporations are subject to careful scrutiny, and if they are shown to have been made and performed in good faith, on fair and equitable terms, without loss to the stockholders or corporation complaining, they will not be disturbed.

The case of **Truman v. Coghlin Machinery Supply Company, 11 Oh Ap 220**, involving two corporations having a majority of directors in common, rather than a minority, states the rule as follows:

"**Syllabus 1.** Directors of a corporation must deal with it in the utmost good faith, and when two corporations have a majority of directors in common, transactions between them are subject to scrutiny and are sustained only if they are fair and made in good faith."

114 A. L. R., page 308, states the rule more rigidly.

The doctrine of corporate opportunity is an application of the rule that directors and officers of corporations shall give their undivided loyalty thereto, and shall acquire no interest adverse to the corporation while acting for the corporation.

Fletcher's Private Corporations, Volume 3, paragraphs 861 to 863, pages 221 to 236. Fletcher states in paragraph 862, page 229, the following:

"A finding of 'corporate opportunity' will be denied wherever the fundamental fact of good faith is determined in favor of the director or officer charged with usurping the corporate opportunity, or where the company is unable to avail itself of the opportunity, or where availing itself of the opportunity is not essential to the company's business, or where the accused fiduciary does not exploit the opportunity by the employment of his company's resources, or where by embracing the opportunity personally the director or officer is not brought into direct competition with his company and its business."

Plaintiff, however, is not claiming that the alleged lost business opportunity, to-wit: Mead Corporation's failure to develop its own sales division, was necessarily an undesirable thing prior to 1936. She is now claiming, in effect, that since Mead Sales Company has done such a good selling job for Mead Corporation since 1932, that Mead Corporation should have not only procured options to purchase Mead Sales stock in 1936, but should have exercised such options as soon as possible after acquiring them.

This reasoning suggests that the Court pass judgment upon the discretion being exercised by Meads Boards of Directors in the 1930s, not in light of conditions then existing, but in light of an extremely successful sales operation which has developed since.

The case of Blaustein v. Pan American Petroleum and Transport Company, 263 Ap. Div. (N. Y.), 97, at page 128 states:

"Our reading of the cases in which the doctrine of corporate opportunity has been applied leads us to the conclusion that one primary requisite for the application of the doctrine is the existence of a presently recognizable, tangible expectancy on the part of the corporation in the property, whether tangible or intangible, at the time of acquisition by the fiduciary."

Blaustein case affirmed 293 N. Y. 281, at 300-304 (1944):

"The rule which permits a court of equity to impress with a constructive trust property which is the product of an appropriation of a business opportunity by a corporation director or officer or a majority stockholder owing some form of fiduciary duty, is not satisfied by proof that after the property is appropriated it occurs that it would have been useful in the corporation's business. The lack in the present case is the essential proof that at the time the properties in question were acquired by SO & G they were recognized or identified as properties in which Pan Am had a tangible expectancy—a right which in its nature was inchoate . . . . To determine whether transactions approved by directors subject them to liability for a breach of duty we look to the facts which relate themselves to the problems involved as they exist at the time of their occurrence, not aided by those which occur subsequently. A wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by."

The acts of directors done honestly, in good faith, will not be interfered with nor disturbed by the Courts.

**Sims v. Brooklyn Street Railroad Company, 37 Oh St 556, at 565** states:

"If, however, the directors who are presumed to represent the will of a majority act within the scope of their powers, their will must govern in the absence of fraud or breach of trust."

## CONCLUSION

It is clear from the foregoing recitation and discussion of the facts as they relate to the issues in this case, and from the law applicable thereto, that plaintiff has wholly failed to make out a case against any of the individual or corporate defendants herein.

As no cause or causes of action have been established by plaintiff against any defendant herein we do not reach and therefore it is not necessary to discuss the questions of laches and limitations of actions, as they might have applied had plaintiff established a cause or causes of action.

Plaintiff has failed technically to qualify as a proper person to bring this derivative action, because she has wholly failed to show any demand on The Mead Corporation Board to bring this action, or any facts excusing such demand by showing that it would have been futile if made.

Furthermore, there is a serious question whether this action was initiated by plaintiff or by others using plaintiff as a front, which raises in turn the question of plaintiff's good faith. No other stockholder, small or large, directly or indirectly, has shown the slightest interest in this

litigation. Plaintiff or her representative could have requested The Mead Corporation Boards in the latter 40s to negotiate modifications of the options and to exercise the options to purchase a majority of Mead Sales stock. This was and is a question of policy for the Mead Boards to determine, not the Court.

It would seem that plaintiff and her counsel, in the exercise of reasonable diligence, care, and consideration, could have presented such request to The Mead Corporation Board of Directors without resorting to this suit, which has tended, without any foundation whatever, to unjustly cast reflections upon individual and corporate defendants herein.

Plaintiff's amended petition will be dismissed. All costs will be assessed against plaintiff.

An entry may be drawn accordingly.